UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7 8 C 8

GARY CONDIT,

     Plaintiff,

- against -

DOMINICK DUNNE,

     Defendant.

**OPINION AND ORDER**

06 Civ. 13126 (PKL)

**APPEARANCES**

STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038
Sandra June Rampersaud, Esq.
Barry Benson Langberg, Esq.
Deborah Drooz, Esq.

Attorneys for Plaintiff

MITCHELL SILBERBERG & KNUPP LLP
12 East 49th Street, 30th Floor
New York, NY 10017
Paul V. LiCalsi, Esq.

Attorneys for Defendant

**LEISURE, District Judge:**

Plaintiff Gary Condit ("Condit") brings this defamation action alleging that defendant Dominick Dunne ("Dunne") made false and defamatory statements about Condit. Dunne moves to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. For the following reasons, Dunne's motion is GRANTED.

## BACKGROUND

Condit, a former member of the United States House of Representatives from the 18th Congressional District of California, brings this action for slander *per se* against Dunne. (First Am. Compl. ¶ 1.) Dunne is a special correspondent to *Vanity Fair* magazine, an author, and a television commentator. (Id. ¶ 2.) Condit alleges that Dunne made false and defamatory statements on a November 16, 2005 broadcast of the *Larry King Live* television program accusing Condit of involvement in the disappearance and murder of Chandra Levy ("Levy"). (Id. ¶ 20.) Levy was a former government intern who disappeared from her downtown Washington, D.C. apartment on or about May 1, 2001. (Id.)

Condit filed a similar lawsuit in December 2002, which was before this Court ("Condit I"). In Condit I, Condit brought claims against Dunne for slander *per se* arising from comments

Dunne made on various talk shows, at dinner parties, and to newspapers. After a decision was issued by this Court on Dunne's motion to dismiss, the parties reached a confidential settlement. The Court assumes familiarity with the facts underlying Condit I, which were more fully set forth in the Court's April 27, 2004 Opinion and Order. 317 F. Supp. 2d 344 (S.D.N.Y. 2004).

The instant action arises out of Dunne's appearance on the November 16, 2005 broadcast of the *Larry King Live* television program. During the broadcast, Dunne was interviewed by guest-host Bob Costas ("Costas"). The transcript of the broadcast is attached to this opinion; however, the Court will briefly summarize relevant portions of the broadcast. During the hour-long program, Costas questioned Dunne on a range of topics, focusing on high-profile crimes. Several minutes into the interview, Costas commented on the entertainment aspect of covering high-profile crimes. (Movit Decl. Ex. B, at 6.) Costas then mentioned Condit I and referenced Dunne's earlier statements about Condit and Levy. (Id.) Costas briefly recounted the "Horse Whisperer" story[1] and Dunne responded by

[1] The Horse Whisperer story is more fully discussed in the Court's Opinion and Order in Condit I, 317 F. Supp. 2d at 349-50. Dunne's summary of the story, as stated during the November 16, 2005 *Larry King Live* broadcast, is as follows:

> I said there was a man who called me -- a horse whisperer, who called me to say that a procurer he had met in Dubai said that my

2

correcting Costas's account of the story and stating that he did
not name Condit in connection with that story. (Id.)  After
further questioning on the topic, Dunne stated his belief that
Condit knows more about Levy's murder than he has ever said.
(Id.)  Costas then asked Dunne about the settlement in Condit I
and Dunne responded that he did not want to talk about it. (Id.)
After a commercial break, the interview continued without any
mention of Condit or Levy.

    Condit filed the instant action on November 13, 2006.  At a
hearing on January 24, 2007, the Court considered a request from
Condit's counsel, Mark E. Goidell, Esq., to withdraw as counsel
for Condit.  Dunne's counsel had informed the Court that he
would be moving for sanctions against Mr. Goidell under Rule 11
of the Federal Rules of Civil Procedure.  The Court granted Mr.
Goidell's request to withdraw, but retained jurisdiction over
Mr. Goidell with respect to Rule 11 sanctions and any other
issues that may arise.[2]  Thereafter, Condit retained new counsel
and filed an amended complaint on April 26, 2007.  In his
amended complaint, Condit alleges that Dunne made three
defamatory statements regarding Condit:  (1) Dunne's retelling

---

    theory, which I said on the "Larry King Show" that she'd gone off
    on the back of a bicycle was incorrect.  It was he who told the
    story that four men had kidnapped her, drugged her and put her on
    a plane. . . .

(Movit Decl. Ex. B, at 6.)

[2] To date, Dunne has not moved for Rule 11 sanctions against Mr. Goidell.

of the Horse Whisperer story; (2) Dunne's statement of opinion that Condit "knows more than he has ever told about that;" and (3) Dunne's statement of opinion that Condit "knows more about what did happen than he has ever said." (Id.) Dunne filed this motion to dismiss on May 24, 2007. Condit opposed the motion on July 20, 2007 and Dunne replied on August 17, 2007.

## DISCUSSION

### I.   Motion to Dismiss Standard

When determining a motion to dismiss for failure to state a claim upon which relief may be granted, "[t]he court's function . . . is not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." Festa v. Local 3 Int'l Bhd. of Elec. Workers, 905 F.2d 35, 37 (2d Cir. 1990). In so doing, the court must "accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." Tarshis v. Riese Org., 211 F.3d 30, 35 (2d Cir. 2000) (citing Desiderio v. National Ass'n of Sec. Dealers, Inc., 191 F.3d 198, 202 (2d Cir. 1999)). As such, a motion to dismiss will be denied "unless it appears to a certainty that a plaintiff can prove no set of facts entitling him to relief." Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984) (citing Conley v. Gibson, 355

U.S. 41, 45-46 (1957)).  "[W]e include in this analysis not only
the assertions made within the four corners of the complaint
itself, but also those contained in documents attached to the
pleadings or in documents incorporated by reference." Gregory v.
Daly, 243 F.3d 687, 691 (2d Cir. 2001) (citing Austin v. Ford
Models, Inc., 149 F.3d 148, 152 (2d Cir. 1998); Cortec Indus.
Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991)); see
also Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir.
1993) ("When determining the sufficiency of plaintiffs' claim
for Rule 12(b)(6) purposes, consideration is limited to the
factual allegations in plaintiffs' amended complaint, which are
accepted as true, to documents attached to the complaint as an
exhibit or incorporated in it by reference, to matters of which
judicial notice may be taken, or to documents either in
plaintiffs' possession or of which plaintiffs had knowledge and
relied on in bringing suit.").

Condit attached to his complaint a DVD recording of the
November 16, 2005 *Larry King Live* broadcast. (First Am. Compl.
Ex. C.)  Dunne, in support of his motion to dismiss, submitted a
transcript of the broadcast. (Movit Decl. Ex. B.)  The Court
takes both the recording and the transcript into consideration
in deciding Dunne's motion to dismiss.  Both the recording and
the transcript are records of the allegedly slanderous
statements made by Dunne, which were referenced and quoted in

5

the complaint. See Condit I, 317 F. Supp. 2d at 357 (taking into consideration audio recording and transcript referenced and quoted in complaint and submitted with defendant's motion to dismiss). The Court does not, however, take into consideration any other documents submitted by the parties in connection with the motion to dismiss.[3]

## II. Choice of Law

As a general matter, a district court sitting in diversity jurisdiction applies the choice of law rules of the state in which it sits. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Lee v. Bankers Trust Co., 166 F.3d 540, 545 (2d Cir. 1999). In New York, the first step in a choice of law analysis is to determine whether an actual conflict of laws exists. Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998); In re Allstate Ins. Co. (Stolarz), 81 N.Y.2d 219, 223, 613 N.E.2d 936, 937 (1993). Because the defamation laws of California and New York conflict, see Condit I, 317 F. Supp. 2d at 352-55, the Court must determine which state's law applies.

---

[3] In support of their motion papers, Dunne and Condit each submitted an attorney's sworn statement opining on the merits of Condit's claim. (Movit Decl. Ex. I (Goidell Aff.); Langberg Decl.) In addition, Condit submitted his own declaration in opposition to Dunne's motion, primarily to assert his continued ties to California. (Condit Decl. ¶¶ 3-6.) The declarations and affidavit are not properly before the Court on defendant's motion to dismiss. See Okwedy v. New York, 195 Fed. Appx. 7, 9 (2d Cir. 2006) (noting that defense counsel's "statements are legal theories rather than facts, and as such cannot constitute binding judicial admissions attributable to the [defendant]."); Condit I, 317 F. Supp. 2d at 355 n.3. The Court notes, however, that consideration of Condit's declaration would not change the Court's choice of law determination.

6

In defamation cases, "New York applies the law of the state with the most significant interest in the litigation." Lee, 166 F.3d at 545; see also Nader v. General Motors Corp., 25 N.Y.2d 560, 565, 255 N.E.2d 765, 768 (1970). Generally, the Court should look chiefly to "the parties' domiciles and the locus of the tort" to determine which state has the most significant interest in the litigation. Lee, 166 F.3d at 545 (internal quotations omitted). The locus of the tort usually is determined by where the plaintiff suffered the injury. See id.; La Luna Enters., Inc. v. CBS Corp., 74 F. Supp. 2d 384, 389 n.2 (S.D.N.Y. 1999). In a defamation case where the statements at issue are published nationwide, however, "the tort essentially lacks a locus, but rather injures plaintiff everywhere at once." Condit I, 317 F. Supp. 2d at 353. Thus, the Court must weigh all the factors that might impact the interests of states with a relationship to the litigation. Id. These factors include: where plaintiff suffered the greatest injury, see, e.g., Davis v. Costa-Gavras, 580 F. Supp. 1082, 1091 (S.D.N.Y. 1984); where the statements emanated and were broadcast, see, e.g., Machleder v. Diaz, 801 F.2d 46, 51-52 (2d Cir. 1986); Levin v. McPhee, 917 F. Supp. 230, 236 (S.D.N.Y. 1996); where the activities to which the allegedly defamatory statements refer took place, see, e.g., Reeves v. Am. Broad. Co., 580 F. Supp. 84, 90 (S.D.N.Y. 1983);

and the policy interests of the states whose law might apply,[4]
see, e.g., Babcock v. Jackson, 12 N.Y.2d 473, 482, 191 N.E.2d
279, 284 (1963).

Here, as alleged in the amended complaint, Condit is a
citizen of California. (First Am. Compl. ¶¶ 1, 3.) Until
January 2003, Condit represented the 18th Congressional District
of California in the United States House of Representatives.
(Id. ¶ 1.) Defendant is a resident of New York, and contends
that the statements emanated in New York. (Id. ¶ 4; Def.'s Memo.
of Law at 17-18.) Defendant's statements were broadcast
nationwide. The policy interests of New York and California in
having their respective laws applied essentially offset. New
York has an interest here in applying its laws to the speaker,
and California has an interest here in applying its laws to the
target. The activities about which defendant spoke --
specifically, Levy's disappearance and the investigation that
followed -- took place in Washington, D.C. Therefore, this
factor favors neither the application of California law nor New
York law.

Weighing the factors, the Court finds that California has
the most significant interest in the litigation. Condit does

---

[4] As in Condit I, the Court notes that it looks to the nine-factor test set
forth in Palmisano v. News Syndicate Co., 130 F. Supp. 17, 19 n.2 (S.D.N.Y.
1955), "not as definitive statements of New York law, but as guidance
consonant with the body of New York law on multistate defamation cases." See
Condit I, 317 F. Supp. 2d at 354 n.2.

not have a significant connection to New York. Additionally,
Dunne's comments have no specific connection to New York.
Although Dunne is a New York resident and was present in New
York when he made the statements, the statements themselves have
no specific connection to New York and the statements were
broadcast nationwide. New York has a significant interest in
the litigation; however, California's interest is stronger. See
La Luna Enters., Inc., 74 F. Supp. 2d at 389 (acknowledging that
"New York has an interest in protecting the free speech rights
of publishers within its borders," but applying Florida law
because, among other things, plaintiff was from Florida and
alleged that it suffered injury in Florida); Machleder, 538 F.
Supp. at 1370 (finding that New York's interest "in establishing
a standard of fault for its news media" is outweighed by New
Jersey's "interest in protecting its citizens from defamation").
Condit would suffer the most damage to his reputation in his
home state of California.[5] See Reeves, 719 F.2d at 605 (holding
that the district court's determination that plaintiff "would

---

[5] Dunne argues that Condit resides in Arizona and not California. (Def.'s
Memo. of Law at 18 n.13.) On a motion to dismiss, the Court must accept the
complaint's allegations as true and draw all reasonable inferences in favor
of plaintiff. See Conley, 355 U.S. at 46; Hosp. Bldg. Co. v. Trs. of Rex
Hosp., 425 U.S. 738, 740 (1976). In the First Amended Complaint, Condit
states that he "is a long-time resident of the city of Ceres in Stanislaus
County, California" and "is a citizen of the State of California for purposes
of diversity jurisdiction." (First Am. Compl. ¶¶ 1, 3.) Regardless, even if
Condit could not be considered a resident of California, as a retired
Congressman from California, Condit's reputation in that state remains
significant.

suffer the most damage to his reputation in his home state was not clearly erroneous, since the state of the plaintiff's domicile will usually have the most significant relationship to the case."). Thus, California law applies here.[6]

### III. Slander *Per Se*

In the instant action, as in Condit I, 317 F. Supp. 2d at 359-62, Condit alleges that Dunne committed slander *per se*. California law defines slander as "a false and unprivileged publication, orally uttered, and also communications by radio or any mechanical or other means." Cal. Civ. Code § 46; see Rodriguez v. Panayiotou, 314 F.3d 979, 983 (9th Cir. 2002); Ringler Assocs. Inc. v. Maryland Cas. Co., 80 Cal. App. 4th 1165, 1179 (Ct. App. 2000). Further, a statement that "charges any person with crime" is one way that a statement qualifies as slander *per se*. Cal. Civ. Code § 46(1); Rodriguez, 314 F.3d at 983. Condit claims that Dunne published false and unprivileged statements, which imputed criminal conduct to Condit. (First Am. Compl. ¶¶ 20-31.) Condit adequately pleads the elements of slander *per se* in his amended complaint. Nonetheless, if it appears beyond a doubt that the facts, as set forth in the

---

[6] The Court notes that even if it held that New York law applies, the outcome would be unchanged because New York law provides a higher level of protection to speech than California law. Condit I, 317 F. Supp. 2d at 352. Condit's claims are not actionable under the First Amendment and California law; they also would not be actionable under New York law.

10

amended complaint, do not support a claim for slander, then Condit's claim must be dismissed.

The Supreme Court has held that First Amendment protection for speech that potentially harms the reputation of others essentially falls into two categories, including (1) limits on the type of speech that may be subject to state defamation actions, and (2) limits on the application of state defamation law to matters of public interest. See Milkovich v. Lorain Journal Co., 497 U.S. 1, 14-17 (1990). Regarding statements of opinion, the Supreme Court has held that the First Amendment does not provide "a wholesale defamation exemption for anything that might be labeled 'opinion.'" Id. at 18. Thus, "the inquiry under the First Amendment and California law focuses on whether the statement's substance or implication constitutes a 'provably false assertion of fact.'" Condit I, 317 F. Supp. 2d at 361 (quoting Rodriguez, 314 F.3d at 987; Dodds v. Am. Broad. Co., 145 F.3d 1053, 1065 (9th Cir. 1998); Partington v. Bugliosi, 56 F.3d 1147, 1152-53 (9th Cir. 1995); Unelko Corp. v. Rooney, 912 F.2d 1049, 1053 (9th Cir. 1990)); see also Milkovich, 497 U.S. at 18-19 ("Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact.").

To determine whether a statement declares or implies a false assertion of fact, the Court takes into account a totality of the circumstances. See Franklin v. Dynamic Details, Inc., 10 Cal. Rptr. 3d 429, 437 (Ct. App. 2004). The Court looks both to the statement itself and to the context in which it was published. Id.; see Partington, 56 F.3d at 1153; Unelko, 912 F.2d at 1053; Rodriguez, 314 F.3d at 987 ("[C]lose consideration must be given to the language, tenor, and context of the statements made in the dispute . . . ."); Cochran v. NYP Holdings, Inc., 58 F. Supp. 2d 1113, 1121 (C.D. Cal. 1998). The Court also considers whether the defendant used figurative or hyperbolic language, and whether the statement is capable of being proved false. Partington, 56 F.3d at 1153; Unelko, 912 F.2d at 1053.

## IV. Dunne's Statements

### A. Horse Whisperer Story

Condit alleges that Dunne committed slander *per se* by republishing the Horse Whisperer story.[7] Condit contends that as

---

[7] The portion of the *Larry King Live* broadcast relevant to Condit's claims regarding the Horse Whisperer story is as follows:

COSTAS: With all the coverage, with talk radio, with cable TV, as we've said, there's a lot of conversation that goes on. And some of it perhaps is not as careful as it should be. Former Congressman Gary Condit sued you for slander. You went on a radio show before the Chandra Levy case -- it's still unsolved, but before all the particulars that we now know were out there. And you offered some speculation that you had heard that perhaps Condit had been indirectly involved, that he knew the reason why

12

a result of Dunne's statements, "members of the general public were led to believe that Condit was involved with Ms. Levy's disappearance and murder and/or that he knew critical facts about the crimes perpetrated upon Ms. Levy but willfully concealed them." (First Am. Compl. ¶ 28.) In support of his motion, Dunne argues that his statements were not about Condit and no reasonable viewer would believe that the Horse Whisperer story was true. (Def.'s Memo. of Law at 12-14.) For the Court, the threshold question is whether a reasonable viewer of the broadcast could conclude that Dunne's statements about the Horse Whisperer story imply an assertion of objective fact. See Milkovich, 497 U.S. at 20-21; Rodriguez, 314 F.3d at 985; Unelko Corp., 912 F.2d at 1053 ("[T]he threshold question in defamation suits is . . . whether a reasonable factfinder could conclude that the statement 'impl[ies] an assertion of objective fact.'")

---

Levy had been killed, that he had arranged to have her murdered. There was speculation that . . .

DUNNE: Wait a minute. Wait a minute. Wait a minute. I never said that anywhere.

COSTAS: According to what I understood, you said that he was aware that some people had taken her on to a plane in a drugged state and her body had been dropped over the Atlantic Ocean.

DUNNE: I didn't say Condit was aware. I said there was a man who called me -- a horse whisperer, who called me to say that a procurer he had met in Dubai said that my theory, which I said on the "Larry King Show" that she'd gone off on the back of a bicycle was incorrect. It was he who told the story that four men had kidnapped her, drugged her and put her on a plane. Gary Condit, I did not name in connection with that.

(Movit Decl. Ex. B, at 6.)

13

(quoting Milkovich, 497 U.S. at 18). Here, a reasonable viewer could not conclude that Dunne's statements imply an assertion of objective fact. Both the context in which Dunne's statements were made and the statements themselves negate the statements' factual connotation.

The Court considers the context in which Dunne's statements were made. In Condit I, the Court took judicial notice of the "media frenzy" and "widespread publicity and speculation that focused on the disappearance of Ms. Levy." Condit I, 317 F. Supp. 2d at 358. Although Condit properly notes that several years passed from when Levy's body was discovered until Dunne's statements were made, only months before the broadcast at issue in this case, Condit and Dunne publicly acknowledged their settlement in Condit I.[8]

Throughout the broadcast, Costas raised a number of high-profile crimes, including the murder of Dunne's daughter, the Robert Blake trial, the Martha Moxley murder, and the O.J. Simpson trial, as well as Levy's murder, and asked Dunne for his immediate comment. (Movit Decl. Ex. B.) In commenting on these crimes, Dunne did not represent himself as an impartial investigator, but rather, admitted that he had a pro-prosecution

---

[8] Condit states that "[i]n March of 2005, less than 8 months before the subject interview, Dunne admitted that he 'had been completely hoodwinked by the horse whisperer's story and now does not believe that source had any knowledge of the facts relating to Ms. Levy's disappearance.'" (Pl.'s Opp. at 11 (quoting First Am. Compl. ¶ 10).)

14

bias. (Id. at 4 ("DUNNE: . . . I am very, very pro prosecution. And that's my stand in life.").) Just before mentioning Condit for the first time, Costas, referring to media coverage, stated that "some of it perhaps is not as careful as it should be" and referred to the "speculation" that Dunne had previously raised in connection with Levy's disappearance. (Id. at 6.)

Introducing the Horse Whisperer story into the interview, Costas called the story "speculation" and stated that it was "before all the particulars that we now know were out there." (Id.) Costas then provided his version of Dunne's Horse Whisperer story. In response, Dunne provided his own summary of the story. After Costas and Dunne had a relatively brief discussion about Condit, Dunne made clear that he did not want to discuss the topic any further.[9]

The context in which Dunne's statements were made demonstrates that they were part of a discussion about "speculation" in the media and inaccurate media coverage. (Id.) Further, the context shows that Dunne made the statements in response to Costas's own summary of Dunne's prior statements that gave rise to Condit I. Therefore, the context makes clear

---

[9] Specifically, in response to Costas's question about the parties' settling Condit I, Dunne states "I'm not going to talk about it, Bob. I'm sorry. It is something in my life that is over with. It has been an extraordinarily unpleasant experience for me and I think for Mr. Condit. And we made a settlement and that's all I'm going to say." (Movit Decl. Ex. B, at 7.) Thereafter, the broadcast went to a commercial break and Condit was not mentioned again.

15

that Dunne is recounting the story to correct Costas's mischaracterization, and not as an assertion of fact. Dunne's Horse Whisperer statements are "not assertions of fact and thus cannot be proved to be false." Dodds, 145 F.3d at 1065.

The statements themselves further support the conclusion that Dunne's description of the Horse Whisperer story did not imply an assertion of fact. In summarizing the Horse Whisperer story, Dunne mentioned Condit merely to state that Dunne "didn't say Condit was aware" and that Dunne "did not name [Condit] in connection with" the Horse Whisperer story. (Movit Decl. Ex. B, at 6.) Condit's assertion that Dunne's statements implicate Condit in illegal activity is "not [an] implication[] the segment reasonably can be understood to convey," Dodds, 145 F.3d at 1065, because Dunne's statements explicitly did not implicate Condit in the story.

Condit argues that because Dunne had named Condit in connection with the Horse Whisperer story in the past, reasonable viewers "would understand that the only reason Dunne repeated the story was because Condit was involved in some way." (Pl.'s Opp. at 8.) Contrary to Condit's assertion, considering the statements themselves and the context in which they were made, a reasonable viewer could not conclude that Dunne was restating the story because Condit was involved. Rather, Dunne plainly states that he is not implicating Condit in the Horse

16

Whisperer story. (Movit Decl. Ex. B, at 6.) Additionally,
reasonable viewers would understand that Dunne's summary of the
story was merely in response to Costas's own summary of Dunne's
prior statements.

When viewing Dunne's statements regarding the Horse
Whisperer story, a reasonable viewer could not conclude that
Dunne's statements imply an assertion of objective fact.
Therefore, Dunne's motion to dismiss Condit's claims with
respect to the statements made about the Horse Whisperer story
is granted.

### B. Opinion Statements

During the broadcast, in talking about Condit, Dunne stated
that he believes that Condit "knows more than he has ever told
about" Levy's murder and that he thinks that Condit "knows more
about what did happen than he has ever said."[10] (Movit Decl. Ex.
B, at 6.) Condit alleges that Dunne's opinion statements

---

[10] The portion of the *Larry King Live* broadcast relevant to Condit's claims
regarding Dunne's opinion statements is as follows:

> COSTAS: Let me correct myself, and I apologize. I don't think
> he killed her, Dunne allegedly said. I think he could have known
> it was going to happen. And then you were quoted elsewhere as
> saying . . .

> DUNNE: Well, that I think is true. And I believe to this day
> that he knows more than he has ever told about that . . .

> COSTAS: Knows more about what happened, or knows more about or
> knew more about what was going to happen before it happened?

> DUNNE: No, I'm not sure about that. But I think he knows more
> about what did happen than he has ever said.

(Movit Decl. Ex. B, at 6.)

17

constitute slander *per se*. (First Am. Compl. ¶¶ 21-32.) Dunne
contends that these statements are "non-actionable as a matter
of First Amendment law because they do not assert or imply a
false assertion of fact." (Def.'s Memo. of Law at 14.) In
support of his motion, Dunne argues that he could not have been
relying on the Horse Whisperer story as the basis for his
opinions because the story was plainly false and that he never
implied that his opinions were based on undisclosed facts.
(Def.'s Memo. of Law at 14-17.) In opposition, Condit argues
that Dunne's opinion statements can reasonably be understood as
being based on the false Horse Whisperer story and imply the
existence of undisclosed facts. (Pl.'s Opp. at 15-20.)

Dunne's opinion statements do not, either in substance or
by implication, constitute "provably false assertions of fact."
Rodriguez, 314 F.3d at 988. As noted above, the totality of the
circumstances demonstrates that Dunne's statements about the
Horse Whisperer story were false and did not implicate Condit.
Contrary to Condit's assertions, the Horse Whisperer story could
not have been asserted as the factual basis on which Dunne based
his opinion statements about Condit.

Similarly, Dunne did not imply the existence of undisclosed
facts. In Condit I, the Court took judicial notice of the
"media frenzy" and "widespread publicity and speculation that
focused on the disappearance of Ms. Levy." Condit I, 317 F.

18

Supp. 2d at 358. Dunne does not suggest that his opinion statements are based on any additional facts not known to the public.[11] Cf. Milkovich, 497 U.S. at 5, 21-23 (holding that statements were actionable where the defendant asserted that he had unique knowledge of facts not known to readers). Dunne "does not imply that he is aware of any undisclosed facts that would lend a factual connotation to his speculation." Condit I, 317 F. Supp. 2d at 369. Dunne's "statement[s] cannot reasonably be understood as anything more than . . . weighing in on the public debate," Cochran, 58 F. Supp. 2d at 1123, that followed Levy's disappearance and murder. Indeed, throughout the broadcast, Dunne weighs in on various high-profile crimes. (Movit Decl. Ex. B.) Further, Dunne "need not have 'let plaintiff off the hook' to gain the protection of the First Amendment for his opinion." Condit I, 317 F. Supp. 2d at 369.

Because Dunne's statements do not declare or imply that false disclosed facts or undisclosed nonpublic facts are the

---

[11] To that end, Dunne never claimed or implied that he had investigated Levy's murder. Condit's contention that Dunne suggested that his statements "would not consist of generalities or supposition but would be based on his first hand investigation of that crime," (Pl.'s Opp. at 10), is unfounded. Dunne's statement "I can only talk about myself in that," was in response to Costas's question about the entertainment element of the coverage of high-profile crimes, which may result in "speculation, things presented as fact or as credible that have not been fully checked out." (Movit Decl. Ex. B, at 6.) Dunne's statement that he could only talk about himself came before Costas even mentioned the Levy case for the first time. Contrary to Condit's assertion, no reasonable viewer could understand Dunne's statement to mean that he had investigated the Levy case first hand. Similarly, Dunne did not present himself as an "expert on the matter" of Levy's murder. (Pl.'s Opp. at 19.)

basis for his opinion, his opinion statements are protected. <u>See</u>
<u>Condit I</u>, 317 F. Supp. 2d at 369-70 ("[B]ecause defendant based
his opinions on information uncontroverted in the complaint and
known to the public, his statements do not sustain a slander
action."). Accordingly, Dunne's motion to dismiss is granted.

## CONCLUSION

For the reasons set forth herein, Dunne's motion to dismiss the complaint against him is hereby GRANTED. Condit's complaint against Dunne is hereby DISMISSED.

**SO ORDERED.**

**New York, New York**

July **8**, 2008

Peter K. Leisure

U.S.D.J.

Copyright 2005 Cable News Network
All Rights Reserved.

CNN

**SHOW:** CNN LARRY KING LIVE 9:00 PM EST

November 16, 2005 Wednesday

**TRANSCRIPT:** 111601CN.V22

**SECTION:** NEWS; Domestic

**LENGTH:** 6199  words

**HEADLINE:** Interview with Dominick Dunne

**BYLINE:** Bob Costas

**GUESTS:** Dominick Dunne

**HIGHLIGHT:**

Interview with "Vanity Fair" special correspondent and novelist Dominick Dunne.

**BODY:**

BOB COSTAS, GUEST HOST: Tonight, Dominick Dunne, the Hollywood insider whose daughter's death at the hands of an ex-boyfriend made justice his passion. He's covered and written about many of the high profile trials of the past two decades. His best seller inspired by the Martha Moxley murder may have helped reopen the case that put Kennedy cousin Michael Skakel on trial.

Dominick Dunne is here for the hour and taking your calls next on LARRY KING LIVE.

Good evening from New York. Bob Costas filling in tonight for Larry King.

Dominick Dunne's resume is extensive. As an 18-year-old he won a Bronze Star on the battlefield at the Battle of the Bulge for saving a comrade who was in jeopardy. He directed some of the Playhouse '90's during the golden age of television. Took acting lessons under Sanford Meisner. Once was a stage manager on "The Howdy Doody Show". These days he's a special correspondent for "Vanity Fair", working on his latest novel even as we speak, and host of Court TV's "Power, Privilege and Justice".

And just to dispense with it, what was "Howdy Doody" really like?

DOMINICK DUNNE, "VANITY FAIR" SPECIAL CORRESPONDENT, NOVELIST: "Howdy Doody" was one of the great experiences of my life. And, you know, live television was something that was extraordinary back then. And I learned more on "The Howdy Doody Show" and I just knew all those guys, Buffalo Bob, and Clarabelle the clown, and that's how I started in TV.

COSTAS: Now you find yourself hosting a program on Court TV. And despite all your other work, the thing that many would associate you with first is your coverage of high profile crimes. Where does your interest in this come from? Primarily? Does it come from your own personal experience?

DUNNE: Well, I mean my interest in justice came from my own personal experience. You know my daughter was murdered by a former boyfriend. And he choked her to death and -- for five minutes -- and there was a trial and he ended up doing two and a half years in prison. And the utter injustice of that, it made me almost crazy, Bob.

And, you know, for a while, you go through a period of revenge. I'm going to get somebody, hire, you know, all that. And when he came out of prison after two and a half years, I hired Anthony Pellicano, the famous private detective, now in prison by the way, and he followed him for a while. And then, you know, I thought, you know if I am involved with something bad, I'll go to prison for life. And I realized I had the talent to talk on television and I have the talent to write about justice. So I started covering trials.

COSTAS: When you had this guy, John Thomas Sweeney, your late daughter's ex-boyfriend, followed, what were you hoping to gain from that?

DUNNE: I just wanted to know what he was up to. What...

COSTAS: Did you hope to catch him in something else that might lead to punishment for that that would be some measure of retribution?

DUNNE: Yes, I suppose. I don't know if I even thought it through. You just go crazy at the time when something like that happens to you. And yes, I mean I wanted to see if he was with another young girl. I wanted to warn, you know and...

COSTAS: Do you know where he is today?

DUNNE: I have no idea. I decided after a while, I don't want that pursuit to be the motive of my life. I don't know. I've never tried to find out. I've never run into him. His name is John Sweeney. He changed it to John Morra (ph) for a while. I don't know where he is, what he's doing.

COSTAS: Has the rage subsided?

DUNNE: Yes. Well, the rage, yes, I mean you can't live in rage. I mean -- but to lose a child in any way is a simply horrible thing. And -- but to violence, and it's part of every day in my life. You know, I have a great life. I mean I'm not -- I mean I go, do things and have fun. And -- but it's part of me. It's part of me that I lost my daughter. And I look on her as a guide to my life. I think she led me into the courtrooms and I truly believe that.

COSTAS: You're a religious person?

DUNNE: Well, I'm not -- you know I'm a Catholic that doesn't go to church. What we call lapsed. And -- but I believe totally in God, completely.

COSTAS: Does your Catholicism, especially from your youth, does it inform your sense of justice in any way, do you think?

DUNNE: No.

COSTAS: No?

DUNNE: No. No. I mean no. It always astonished me at the trial of John Sweeney, the jury and that they came -- you know, one of the women on the jury had like four daughters. And I just never got it why they -- and a lot was kept

from them.

John Sweeney had a history of violence against women. There was another woman who wanted to come forward and be a witness. It happened to her. He had beaten her and hospitalized her. But the judge wouldn't allow that.

And so the jury didn't know everything. And a woman on the jury who was in her 80's wrote me a letter recently -- well, about a year ago and apologized, said it's bothered her about the verdict on the thing. And she sort of wanted to clear it up before she died. I thought that was very touching.

COSTAS: Is she the only juror whom you've heard from?

(CROSSTALK)

COSTAS: Or did you speak with some of the others in the immediate aftermath?

DUNNE: No.

COSTAS: How is it possible that since it wasn't in dispute that he's the person who committed the crime, how was it possible that he received a sentence, voluntary manslaughter was the verdict, that he received a sentence of only six years, eventually was released after two and a half and with time served prior to the trial a little bit less than four years incarcerated.

DUNNE: No, no, wait a minute -- not at all. The six years was cut in half immediately to three years. And he served two and a half years. That is all he served.

COSTAS: Including the time prior to the trial, including the time he was detained prior to the trial?

DUNNE: Oh prior to the trial, no...

COSTAS: That's what I was referring to...

DUNNE: I'm sorry.

COSTAS: ... combining the two. But how is it possible given the fact...

DUNNE: Well...

COSTAS: ... that someone was murdered here, whether technically it's voluntary manslaughter or not, how is it possible that that light a sentence was meted out?

DUNNE: Well you know every ruling went in favor of the defense in the trial. And the judge in the trial and the prosecutor had a bad experience on a previous trial. And I'm quite honestly very bitter about the judge. And I think in many ways he was responsible for that.

COSTAS: You covered the trial itself, right?

DUNNE: That was the first time -- let me tell you what had happened is that Tina Brown -- I had met the night before I left to attend the trial, not to cover the trial. And she told me then that she was about to become the editor of "Vanity Fair" magazine. And she -- I met her the night before.

And she said -- she called me the next day and she said, keep a journal. It will help you get through it. And come and see me when it's over. And the journal was a savior for me during that trial. And I did come and see Tina. And I wrote my first article that I'd ever written "Justice" for "Vanity Fair" for Tina's first issue as the full editor. And I've been there ever since.

COSTAS: You've covered many of the high profile trials, Claus von Bulow, the Menendez brothers, William Kennedy Smith, of course O.J. Simpson. Is it possible, not commenting on the particulars in this case of any of these individual trials, but is it possible that your personal experience and your zeal to see justice done leaves you too much in the corner of the prosecution?

DUNNE: Not for me. I'm -- no, not for me at all.

COSTAS: Is it a valid question to ask do you think?

DUNNE: Yes, yes, I suppose so and people could have asked that. But I mean I've always -- I mean there was never any doubt to me that O.J. Simpson was guilty. There was never any doubt to me that the Menendez brothers shot their parents. There was -- you know -- and I am very, very pro prosecution. And that's my stand in life.

COSTAS: Although very quickly before the break, you wrote recently that despite that pro prosecution stance, you were very happy to see Robert Blake...

DUNNE: No, I didn't say very happy. But yes, you know I did. I felt sorry for Robert Blake.

COSTAS: Why?

DUNNE: I just don't know. He touched my heart somehow and the -- and don't ask me why, but he did.

COSTAS: Touched your heart personally.

DUNNE: Yes.

COSTAS: Does that mean you think he was not guilty?

DUNNE: No, I didn't say I didn't think...

COSTAS: Yes...

DUNNE: ... he was not guilty.

COSTAS: ... well, that's why I asked.

DUNNE: I didn't say that and -- because certainly had something to do with it and -- but I don't know why. I didn't hate him the way I hate some of these murderers that I have covered.

COSTAS: All right. Dominick Dunne is with us for the hour on LARRY KING LIVE. As we head into this break, let's take a look at a clip from his program on Court TV, "Power, Privilege, and Justice".

(BEGIN VIDEO CLIP)

DUNNE: When I heard that one of the Gucci's was gunned down, my first thought wasn't did he have any enemies, but which enemy actually pulled the trigger?

I never got tired of hearing about the Gucci family fights. I remember one story where workmen at the Gucci headquarters found the lawn littered with $500-handbags. It turns out the family members upstairs were hurling the bags at each other and some sailed out the window.

If the carbineer (ph) were going to crack this case, they needed to know everything about the family business.

(END VIDEO CLIP)

COSTAS: Back now with Dominick Dunne, the "Vanity Fair" special correspondent, novelist, Court TV star who recently, appearances to the contrary, celebrated his 80th birthday. Belated congrats to you.

A less happy anniversary is the 30th anniversary of the murder of Martha Moxley, 15 years old when she was bludgeoned to death near her home in Connecticut. Three years ago a Kennedy cousin, Michael Skakel, was convicted of the crime. There is some feeling that your reporting and your writing about it kind of reopened the case or reenergized the case.

DUNNE: It certainly reopened the case. The case had been long dormant for years. And I was at the William Kennedy Smith rape trial in Palm Beach, and this bogus rumor started that William Kennedy Smith had been in the Skakel house on the night of the Martha Moxley murder in 1975. And I went back to Greenwich to check it out, and he hadn't been in the house. And -- but I thought, what happened to that case? What happened to that case?

And I found that the mother, Mrs. Moxley, had moved away to Annapolis, Maryland. And I sought her out. I went to Annapolis. She'd only meet me in the coffee shop of the Baltimore Washington Airport. And I said why did you move away? There's nobody -- there's nobody fighting for you. And she said she couldn't look into the Skakel house.

She didn't know who did it, but she knew in that house they knew. And I told her that I, too, was the parent of a murdered daughter, and I was on a roll at that time and had written a lot of bestsellers and mini series. And I said I could write a bestseller and -- that would bring attention to your daughter's murder. And then when the book came out, Dan Rather did a seven-minute segment on the "CBS Nightly News" saying how a best-selling novel had reopened a case. And it became a mini series and eventually, a trial.

COSTAS: Skakel was sentenced to 20 years to life. He's appealing...

(CROSSTALK)

COSTAS: ... that conviction right now. Robert Kennedy Jr. was on this program with Larry King some time ago.

(CROSSTALK)

COSTAS: He holds you responsible, if that's the right word. It could be taken as both a positive and a negative. In this case, clearly he's looking at it negatively. He says that you are responsible for his cousin being brought to trial and in his view, wrongly convicted. Let's take a look at what RFK Jr. said.

(BEGIN VIDEO CLIP)

ROBERT F. KENNEDY, JR., MICHAEL SKAKEL'S COUSIN: I think you know Dominick Dunne is what Dominick Dunne is. He's not a journalist. He's a gossip columnist. And he entertains people. That's how he makes his money and he has this formula where he finds notorious crimes and he connects them to wealthy people. And it's a formula that's worked very well for him. It's produced a whole bunch of mini series and best sellers and it's a formula that has appealed to the public. The problem is he doesn't really even pretend to be accurate.

(END VIDEO CLIP)

COSTAS: All right, your response.

DUNNE: I have seen that clip so many times and listened to him so many -- and he said I intimidated the police into making the arrest. He originally said. I mean it's ludicrous. There was a report paid for by the Skakel family in which Michael Skakel changed his story from the original story that was given.

I mean Robert Kennedy Jr. is someone for whom I have no respect whatsoever. And he's made this thing about the trial, although he only came to the trial twice. And he has all these theories. And Michael Skakel was found guilty by a

.

jury of his peers and no matter what happens in the appeal that is not going to be erased.

COSTAS: Without referring to the Skakel case in particular, you would agree that the coverage of high profile crimes has taken on an element of entertainment. It's fodder for cable television. It's fodder for magazines and newspapers, and in some cases excesses are almost certain to occur, speculation, things presented as fact or as credible that have not been fully checked out. You would acknowledge that, right?

DUNNE: Yes, but he's talking about me that way...

COSTAS: I'm not talking about you...

DUNNE: Yes.

COSTAS: ... specifically.

DUNNE: Yes.

COSTAS: I'm talking about the general tone...

(CROSSTALK)

COSTAS: ... that's out there.

DUNNE: Well, I guess so. But I can only talk about myself in that. And always the family of the defendant hates the person who writes, you know, pro prosecution. And that's going to happen and I'm used to that happening.

COSTAS: With all the coverage, with talk radio, with cable TV, as we've said, there's a lot of conversation that goes on. And some of it perhaps is not as careful as it should be. Former Congressman Gary Condit sued you for slander. You went on a radio show before the Chandra Levy case -- it's still unsolved, but before all the particulars that we now know were out there. And you offered some speculation that you had heard that perhaps Condit had been indirectly involved, that he knew the reason why Levy had been killed, that he had arranged to have her murdered. There was speculation that...

DUNNE: Wait a minute. Wait a minute. Wait a minute. Wait a minute. I never said that anywhere.

COSTAS: According to what I understood, you said that he was aware that some people had taken her on to a plane in a drugged state and her body had been dropped over the Atlantic Ocean.

DUNNE: I didn't say Condit was aware. I said there was a man who called me -- a horse whisperer, who called me to say that a procurer he had met in Dubai said that my theory, which I said on the "Larry King Show" that she'd gone off on the back of a bicycle was incorrect. It was he who told the story that four men had kidnapped her, drugged her and put her on a plane. Gary Condit, I did not name in connection with that.

COSTAS: Let me correct myself, and I apologize. I don't think he killed her, Dunne allegedly said. I think he could have known it was going to happen. And then you were quoted elsewhere as saying...

DUNNE: Well, that I think is true. And I believe to this day that he knows more than he has ever told about that...

COSTAS: Knows more about what happened, or knows more about or knew more about what was going to happen before it happened?

DUNNE: No, I'm not sure about that. But I think he knows more about what did happen than he has ever said.

COSTAS: It's very difficult for a public figure to win a libel or slander suit in the United States because the

standards are that not only do you have to prove that what was written or said was knowingly false, but that there was some malice attached. It is a very high standard.

The case was settled, which might lead some to infer that had the case played itself out, even if Condit didn't prevail in court, it would have been unflattering for you. That something about this made you uncomfortable. Something about this you wanted to back away from and so it was better to settle. Is that fair to say?

DUNNE: No. No, I don't. I don't. I'm not going to talk about it, Bob. I'm sorry. It is something in my life that is over with. It has been an extraordinarily unpleasant experience for me and I think for Mr. Condit. And we made a settlement and that's all I'm going to say.

COSTAS: And we'll take this break.

COSTAS: Continuing with Dominick Dunne on LARRY KING LIVE. The portion of America that might not have known you came to know you well during the O.J. Simpson trial for both your writing about the case and your many appearances on cable TV. And then came the book "Another City, Not My Own". You referred to the O.J. case as a morality tale for America. You said earlier on this program no doubt in your mind that O.J. was guilty. Why then did the jury blow it?

DUNNE: I think it was almost predestined to end up that way. That was one of the most fascinating experiences of my life. I mean I was there for almost a year in L.A. at that trial and in the courtroom every day of that trial. It was -- I don't know what. It sort of -- how it caught on with America in a way that no other trial has to my -- in my time. And it had all the elements of, you know, glamour and beautiful people and rich people, with Rolls Royce's and red brick mansions.

COSTAS: And race.

DUNNE: And race and race and an interracial marriage and children. And a murder really beyond -- I mean, I've seen the autopsy pictures. And I mean a head almost removed. And you know I watched the freeway chase. I watched -- from the first moment that it happened and I heard about it, I just -- I knew I was going to be involved in that case.

And when Al Cowlings and O.J. came back after the Bronco chase back to his house and the police were there, and when they put the handcuffs on him, I don't know, that's when I said, he did it. He did it. I mean if he didn't do it and they handcuffed you, you know, you'd -- you'd fight it. You would do something and I never doubted for a moment that he did it.

COSTAS: On that day in October of 1995, as the verdict was about to be read, were you just as certain that the verdict was going to be guilty as charged? Were you shocked?

DUNNE: I was shocked. I was shocked. And reasonably I shouldn't have been because I've been to enough trials. You know, yes, I was shocked. My mouth was hanging open. And I was really -- I was really deeply upset about that. And -- but you know, years have passed and I'm not emotional about the case anymore. And the fact is that the prosecutors lost the case, and the defense was simply better and more organized.

And you know it's a case that will be argued forever, I suppose. And I'll never forget that day of the verdict. I mean all of America was watching that. And I went on TV almost instantly after that, too soon and Greta Van Susteren was in -- where was she? In Washington somewhere and I was in California and she said the jury has given its message to the L.A. police.

And I said, well that wasn't their function there. And I was all -- and we got into a thing. And I took my microphone off and I threw it at the camera. I mean I'm not that like that at all, but I got so crazed that day. And I also got booed outside the courtroom and you know trying to get to my car. And it was scary.

.COSTAS: We have just a minute here, but we'll continue talking about the O.J. Simpson case on the other side of the break. But when Johnnie Cochran recently passed away, you wrote a nice remembrance of him in "Vanity Fair".

DUNNE: I did because I've got -- you know Henry Schleiff, who's the head of Court TV, the CEO, said this has gone on enough. Because Johnnie and I were adversaries and we made up and we hugged and I went to his funeral.

COSTAS: Dominic Dunne is with us for the hour. A bit later on we'll take your phone calls. Got some business to take care of. We'll run these commercials and be back on LARRY KING LIVE in just a moment.

COSTAS: Back once more with Dominick Dunne.

Before the break you made the point that it had been noted that the jury in the Simpson trial sent a message to the LAPD.

It seems that a lot of people who covered the trial, had an interest in the trial, were perfectly able to digest the points that the justice system is often racist, often unfair, that this trial could have been used to highlight some of those points about the difference between a privileged defendant and someone who is impoverished, about rogue cops, about every inequity and was probably a good opportunity for those issues to be at large. None of those necessarily prove that the defendant didn't commit the crime.

Why was it so difficult to make that distinction, which seems like a fairly simple distinction, the distinction between the social issue that were brought up, which may have been legitimate, but the guilt or innocence of this individual.

DUNNE: Yeah. Well, you know, I think there are a lot of things going there. You know, he was an American hero.

And I think they always feared from the beginning that if he was found guilty, that there would be riots afterwards. I think that was the reason the case was moved from Santa Monica to downtown L.A. So it would not be an all-white jury.

And I think he had one of the best teams, and that was put together by Robert Shapiro, who was the first lawyer. And he brought in Dr. Henry Lee. And their knowledge of DNA was incredible. It was over the heads of the jurors.

And the jury did not like Marsha Clark. And -- The women. The African American women were all very religious church-goers. And she had a flirtatious manner and wore very short skirts and there was something they didn't like her. And there's certain amount of flirting going on with Chris Darden. And ...

COSTAS: All of this very interesting and perhaps valid as considerations, but should have been peripheral. We call upon 12 citizens to focus on the essence of the case.

DUNNE: Yeah.

COSTAS: Not on peripheral issues.

DUNNIE: And Johnny Cochran gave a wonderful wrap-up speech, there's no two ways about it. Johnny Cochran was a charismatic figure. And he had that whole courtroom in the palm of his hand. He was -- he ran the show, not Judge Ito. And it was Johnny Cochran's high moment of his life.

You've written about Judge Ito being so star struck that he was writing letters to well known people during the course of the trial and asked you at one point to give his regards to Princess Diana?

DUNNE: I had forgotten that.

COSTAS: True though, right?

DUNNE: He did. He did. On like a four-day break in the trial, I flew to England to meet Princess Diana because I was one of the people up for possibly interviewing her for her disastrous television show -- television appearance. I would have done it in print. And yeah, he did.

COSTAS: What is Judge Ito up to today? Is he still hearing cases?

DUNNE: Yes, he is. But he very wisely didn't write a book and dropped out of -- off the radar screen. He is still there. And Judge Ito is, by the way, as a man, he's a very good man. And Judge Ito called me into his chambers, and he gave me a seat in the front row of the court courtroom so I sat with either the Brown family or the ... COSTAS: Goldmans?

DUNNE: Goldman family, sorry. And because he knew that having lost a child myself, that I would know how to -- and I was very touched by that, that he had that sort of sympathy for the families. And -- but what happened was the whole thing got -- they all got too famous. And it changed them all. Judge Ito was on the cover of "Newsweek." and Marsha Clark, there was a plane over with banners about her new hairdo.

I mean, it was a circus. It was a show. It was -- and there were crowds of people outside all the time. I've never been to a trial like that one.

COSTAS: From where you sit, has the concept of reasonable doubt been misunderstood by juries and misunderstood or misrepresented by some commentators? It seems sometimes that people will contend that reasonable doubt has been created if there is a flaw in any aspect of the case. But, although I'm not a legal expert, it would seem to me that reasonable doubt would be properly defined as once you have looked at all the evidence, is there some reasonable doubt in totality? Not is there a single speck of this case that is amiss.

DUNNE: I think that's right. Reasonable doubt is a hard thing to define. Now, Larry's doing -- Larry King's doing a book on reasonable doubt. And everybody -- I've seen some of it. Everybody has got a totally different interpretation of it.

COSTAS: Your phone calls for Dominick Dunne when we return. Bob Costas filling in tonight from New York for Larry King.

(BEGIN VIDEO CLIP)

UNDENTIFIED MALE: What made me suspicious was that the drawers on this dresser were all left open the same distance, all the drawers. To me, that's suspicious because it really looks staged, that it was made to appear to be a burglary rather than a murder.

DUNNE: Elizabeth Congdon in the bedroom with a satin pillow. Where were Colonel Mustard and Miss Scarlet? A murder mystery was playing out behind the iron gates of Glensheen.

(END VIDEO CLIP)

COSTAS: We're with Dominick Dunne, "Vanity Fair" special correspondent, novelist, host of Court TV's "Power, Privilege and Justice."

And as promised, let's go to the phones. Columbus, Ohio. Hello.

CALLER: Hello. Mr. Dunne, I want to thank you. You are a hope and an inspiration to we, the millions who have lost a family member to violent crime. My question to you is about when justice has not been served.

My brother was murdered by the employee of a very prominent Memphis nightclub in 1997, the bouncers. He was choked, strangled and beaten to death before scores of eyewitnesses and it was also videotaped by some tourists from Minneapolis.

No one was ever charged with the crime and it was not brought to trial. However, my parents did win a civil suit. My parents both are deceased now. I really think this case factored into their demise. I have tried writing the prosecutor of Memphis, but they will not answer my letters. And I guess if I have a general question, it would be what can -- what sort of course do you recommend when justice has been denied? Is there something you can suggest?

COSTAS: Thank you for your question.

DUNNE: Yeah, well, that's a very, very good question.

And I'm terribly sorry that such an awful thing has happened to you. It's pretty hard. I mean, if your letters aren't being answered, I mean, I think this is -- I think this is a sign that nobody wants to get involved in this. I mean, I really wouldn't know how to - I think you should probably, if you can write, you should write it up and submit it or have it put in a newspaper so that people can get behind you.

COSTAS: Just curious. In all the crime coverage that you've done, have you ever been called for jury duty? Have you served on a jury?

DUNNE: I just walk in and they just say -- you know. All the defense attorneys just -- it always gets a laugh when I go up.

COSTAS: If someone you cared about were charged with a serious crime, charged with murder, who would you want to defend them? If you could hire anybody for the job, who would you hire?

DUNNE: For a murderer?

COSTAS: Or an accused murderer?

DUNNE: An accused murder.

Well, there's several. I think Roy Black (ph) is a superb - I think Tom Puccio. Tom Puccio gets not enough credit for his work on the Claus von Bulow case. He was the trial lawyer. You always heard about Alan Dershowitz. But Alan Dershowitz was the appeal lawyer. And Tom Puccio was the trial lawyer. He was a very, very good lawyer. And I think he's a very decent man.

COSTAS: How good -- and I realize this is a broad question -- how good is the American justice system in your estimation? How often is justice done?

DUNNE: Oh, I don't know how to answer that. But listen, we've got the best system there is in the world. And it's flawed. And -- but you know, I'm always impressed with juries. I really am. And I've seen so many of them. Because, once they're sworn in, I mean, they take that very seriously. And it doesn't apply to the O.J. case. As I said, that was predestined. That was going to happen no matter what. He, he was not going to be found guilty, I don't think.

But in most case, when jurors fight in the deliberation, I mean just love that. That they care that much. And we've got the best system.

COSTAS: Is there something at work -- clearly there is -- in the case of celebrity defendants that skews this?

DUNNE: Yeah. Well, you know, celebrity defendants, it is incredible that the power of celebrity -- I mean, there are some people who are celebrities who go on a trial, but there's some people who become celebrity like the Menendez

brothers. They became famous.

COSTAS: Or Scott Peterson in a perverse way.

DUNNE: Or Scott Peterson, true. Yes, indeed. He became famous. But I think a celebrity like Michael Jackson, O.J., it's a different cup of tea. I mean, there's something about them that dazzles. I mean, Michael going into court every day with a different thing. And that whole makeup ...

COSTAS: It could have also repelled, though. It could have dazzled but also, to some people, repelled.

DUNNE: Well, a lot of people were repelled, but not the jury.

COSTAS: Evidently not. Anderson Cooper is standing by. His program, ANDERSON COOPER 360 comes your way at the top of the hour.

Anderson, what do you have for us tonight?

ANDERSON COOPER, CNN HOST: Hey, Bob, thanks very much.

Coming up tonight, a dose of accountability. Why after so many weeks are people in New Orleans still getting the runaround on identifying their dead loved ones. So far a lot of finger pointing. We are going to try for some answers instead from the governor of Louisiana. We're calling the segment "Keeping Them Honest."

Also ahead, how can you live to be 100? We're traveling the globe in search of longevity secrets. What do they know in Japan, the Mediterranean and some parts of California that you may not and can doing what they do extend your life? That's 360 tonight in about 14 minutes from now, about.

COSTAS: All right, Anderson, we'll look forward to that.

And our remaining moments with Dominick Dunne when we continue from New York after this break.

COSTAS: Let's take a look at a clip from the film which is currently out starring Philip Seymour Hoffman as Truman Capote. Let's take a look because Mr. Dunne was an acquaintance of Truman Capote.

(BEGIN VIDEO CLIP)

PHILIP SEYMOUR HOFFMAN, ACTOR: I decided on a title for my book. I think you'll like it. It's very masculine. It's "In Cold Blood." Isn't that good?

UNIDENTIFIED MALE: And that refers to the crime or the fact that you're still talking to the criminals?

(END VIDEO CLIP)

COSTAS: Hoffman's performance has been widely praised as Oscar worthy. You knew Capote. Does he capture it?

DUNNE: I did indeed. I think Philip Seymour Hoffman's portrayal is absolutely staggering. It is wonderful.

And Truman was a complicated fellow. And he was charming and he was duplicitous. And Philip Seymour Hoffman just catches that so perfectly. He was jealous, he would do his thing, then he'd do something wonderful.

And there's a scene in the movie in the cell with the killer where he finally gets the killer to explain the four murders in the Clutter family. And, you know, which he needs in order to finish his book. And it's a great, great scene.

COSTAS: "In Cold Blood" brought that combination of the approach of a novel but also reportage and some of

those lines may be blurred. You and others that have followed owe a debt to Truman Capote for that.

DUNNE: Absolutely. Absolutely, I owe a debt to him. And he once did a very kind thing to me during a bad period of my life when I was in, I left L.A. and had a drinking problem and other things. And I lived in a cabin in Oregon for six months. And he wrote me a letter there. And, you know, to express admiration for what I had done because what I had done is what he should have done or he wouldn't have been dead so young. He had a major drink problem.

COSTAS: To go and dry himself out.

DUNNE: Yeah.

COSTAS: By one means or another.

DUNNE: Yeah.

COSTAS: Speaking of your years in Hollywood, here's an interesting quote of yours. "When you're down and out there's no meaner place to live than Hollywood. You can get away with your embezzlements and your lies and your murders, but you can never get away with failing."

DUNNE: That's right. That's so true, still, still. And I was there for 25 years. I was in the movie business, did some good movies, did a couple of clinkers. And I left it all and started at age 50, I started this new life of writing.

COSTAS: Tell me the story about be the time that Sinatra paid a waiter 50 buck ors something ...

DUNNE: To hit me.

COSTAS: To pop you.

DUNNE: Sinatra for some reason never liked me. I had stage managed him in "Our Town" the musical version of "Our Town" with Sammy Cahn and Jimmy Van Heusen music. And Paul Newman and Eva Marie Saint were -- it was incredible.

And I don't know if it start there'd orb what, but it was the first time I ever saw a star really behaving badly. And anyway, so it always -- and the years passed. And it was never nice. So I was in a nightclub called the Daisy. And a waiter tapped me on the shoulder. He was somebody I knew very well.

And he said -- I looked up at him like this. And he said, oh, I'm terribly sorry Mr. Dunne, Mr. Sinatra made me do this. And he hauled off and hit me, punched me. And it was awful.

And I could look over and there's Frank sitting at the next table like with pleasure in his eyes. And he's sitting with Nancy, his daughter, and Tina, his daughter both of whom I knew and with Mia Farrow whom he was then engaged to. I knew them all. It was this awful experience.

COSTAS: We have about 15 seconds. As you told the story, you paid the guy $50. The guy could be bought off that cheaply? He was Frank Sinatra, but you were a regular customer, too.

DUNNE: Fifty bucks was a lot of money in the '60s. That's when it happened. And he was a good guy. He was a phrased (ph) Italian. And he was afraid not to. And he cried afterwards. He followed me out to the car. He cried, this poor guy. But he was afraid not to do what Frank told him.

COSTAS: Dominick Dunne, back after this.

COSTAS: In our closing moments now with Dominick Dunne. You've been at this a long time. What's the

difference between the old celebrity journalism and present celebrity journalism?

DUNNE: Well, it's very, very different. I mean, the old celebrity journalism, there was -- you know, I was fortunate enough to be there to see the end of the studio system with the actors under contract. And they learned. You know, I did a movie with Elizabeth Taylor at the peak, utter peak of her fame and beauty and marriage to Richard Burton.

And she was trained by MGM, and she was pursued by the paparazzi. We were in Italy for a year. And she was pursued. But you know, she always said, OK, guys, I'll give 15 minutes and take your picture, so forth. Now there's all this stuff of paparazzi chasing people in cars. It's very dangerous what's happening now.

And it's a whole different thing. I mean, the photographers hanging out in every restaurant. I mean, there's no privacy for them at all now.

COSTAS: Some would say with few exceptions celebrity journalism is actually an oxymoron, that it's all just gossip. It might be high toned gossip in "Vanity Fair" or it may be a lower level of gossip someplace else, but it's all just gossip.

DUNNE: Well, I mean, are we talking about Paris Hilton? There are these people who crave publicity like Paris Hilton, and then there's the ones who avoid it. And those are the ones that get chased. And I just think that they learn like Elizabeth, you know, to have their picture taken and stop and speak to the guys, then say that's it, it would be much better.

COSTAS: Half a minute here.

Camilla Parker Bowles recently in the United States with Prince Charles. And my personal reaction is, A, why does anyone care, but B to the extent that they care, why are they so mean? Why not just leave the woman alone?

DUNNE: It was awful what they did to make fun of her when she came here and her clothes and everything. But you know, the thing is, for the future king of England and everything, they didn't cause a ripple in the -- do you know what I mean? As compared to when Princess Diana used to come and the town would go mad.

And they - They weren't on the radar much.

COSTAS: Dominick Dunne, so much more territory to cover but we are flat out of time. Thank you very much for being with us tonight.

Tomorrow night, Rosie O'Donnell, and up next, ANDERSON COOPER 360. He is standing by just across the way. Anderson, you got it.

COOPER: Bob, thanks very much. Great hour with Dominick. Thanks very much.

The war over the war in Iraq just got hotter. The man with the flamethrower,

TO ORDER A VIDEO OF THIS TRANSCRIPT, PLEASE CALL 800-CNN-NEWS OR USE OUR SECURE ONLINE ORDER FORM LOCATED AT www.fdch.com

**LOAD-DATE:** November 17, 2005